Filed 8/21/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B331652 |
|     Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. VA090994 |
| EDDIE SORTO, | |
|     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa S. Coen, Judge. Reversed and remanded.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Jonathan Grossman and Mi Kim for Pacific Juvenile Defender Center as Amicus Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

A court sentenced Eddie Sorto to more than 100 years in prison for crimes he committed when he was 15 years old. After serving 15 years of his sentence, Sorto petitioned for recall and resentencing under Penal Code section 1170, subdivision (d) (section 1170(d)).[1] Sorto acknowledged the statute expressly applies only to juvenile offenders sentenced to explicit life without the possibility of parole (LWOP) terms. Nevertheless, he argued equal protection guarantees relief to offenders, like himself, sentenced to long prison terms that are the functional equivalent of LWOP.

About a year before the trial court considered Sorto's petition, the court in *People v. Heard* (2022) 83 Cal.App.5th 608 (*Heard*) held juvenile offenders sentenced to functionally equivalent LWOP terms are entitled to section 1170(d) relief under the constitutional guarantee of equal protection. Despite this authority, the trial court denied Sorto's petition on the ground that he had not been sentenced to an explicit LWOP term. On appeal, Sorto raises the same equal protection argument and urges us to follow *Heard*. The Attorney General argues *Heard* was wrongly decided and is contrary to California Supreme Court precedent.

We reject the Attorney General's arguments and conclude offenders sentenced to functionally equivalent LWOP terms— like Sorto—are entitled to section 1170(d) relief under the constitutional guarantee of equal protection. We also hold parole eligibility under section 3051 does not render those offenders ineligible for relief under section 1170(d). Accordingly, we reverse the trial court's denial of Sorto's petition and remand

---

[1]     Undesignated statutory references are to the Penal Code.

2

the case for the court to consider whether Sorto meets the other requirements for relief.

## FACTS AND PROCEDURAL BACKGROUND

**1.** *The convictions and sentence*

Sorto committed a series of crimes against members of a rival gang in August 2005, when he was 15 years old. A jury convicted him of first degree murder (§ 187, subd. (a)), assault (§ 240), second degree murder (§ 187, subd. (a)), and shooting at an occupied motor vehicle (§ 246). The jury also found true multiple-murder and gang-murder special-circumstance allegations (§ 190.2, subd. (a)(3), (22)), as well as various firearm and gang enhancement allegations (§§ 12022.53, subds. (b), (c), (d), 186.22, subd. (b)(1)(C)). The trial court sentenced Sorto to a determinate term of 10 years plus an indeterminate term of 130 years to life.[2]

**2.** *Sorto's petition for recall and resentencing*

In 2023, Sorto filed a petition for recall and resentencing under section 1170(d), arguing he satisfied all the statutory requirements for relief. Sorto asked the court to recall his sentence and send his case to the juvenile court for a transfer hearing under Proposition 57 (as approved by voters, Gen. Elec. (Nov. 8, 2016)).

Sorto acknowledged that section 1170(d) expressly applies only to juvenile offenders sentenced to explicit LWOP terms. Nevertheless, he argued he is entitled to relief because his

---

[2]     Although the jury convicted Sorto of first degree special circumstance murder, he was not eligible for an LWOP sentence because he was 15 years old when he committed the crime. (See § 190.5, subd. (b).)

3

sentence is the functional equivalent of LWOP. In support, Sorto cited *Heard, supra*, 83 Cal.App.5th 608, which held a juvenile offender sentenced to a term that is the functional equivalent of LWOP was eligible for section 1170(d) relief under the guarantee of equal protection.

The People opposed Sorto's petition. Among other things, the People argued Sorto is not serving a functionally equivalent LWOP sentence because he is eligible for parole during his 25th year of incarceration under section 3051. The People also urged the court not to apply *Heard*, arguing it was wrongly decided.

In a reply brief, Sorto argued *Heard* is binding precedent and trial courts are required to follow it.

The court denied Sorto's petition. Without explanation, the court stated it did not find *Heard* to be "on point with our specific factual scenario." The court then explained that, because Sorto is eligible for parole after 25 years under section 3051, he is not serving an LWOP sentence. The court held, "as a matter of law, because the defendant was not sentenced to life without the possibility of parole, he is not entitled to relief under [section 1170(d)]." The court did not directly address Sorto's equal protection argument.

Sorto timely appealed.

## DISCUSSION

Sorto argues the trial court erred by denying his section 1170(d) petition because he was not sentenced to an explicit LWOP term. Sorto concedes section 1170(d) expressly applies only to juvenile offenders sentenced to explicit LWOP terms. Nevertheless, he argues the statute violates the equal protection clauses of the federal and state constitutions to the extent it

4

denies relief to juvenile offenders sentenced to the functional equivalent of LWOP.

**1.** ***Equal protection***

The Fourteenth Amendment to the United States Constitution and article 1, section 7 of the California Constitution prohibit the denial of equal protection of the laws. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a).) "At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification." (*People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).)

Where, as here, the challenged law is not based on a suspect classification and does not burden fundamental rights, the law denies equal protection "only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose." (*Chatman, supra*, 4 Cal.5th at pp. 288–289; see *Heard, supra*, 83 Cal.App.5th at pp. 631–634 [applying rational basis review to a claim that section 1170(d) violates equal protection].) Under rational basis review, we presume a classification in a statute is rational until the party challenging it establishes there is no conceivable rational basis for the unequal treatment. (*Chatman*, at p. 289.) "The underlying rationale for a statutory classification need not have been ' "ever actually articulated" ' by lawmakers, and it does not need to ' "be empirically substantiated." ' [Citation.] Nor does the logic behind a potential justification need to be persuasive or sensible—rather than simply rational." (*Ibid*.)

"This core feature of equal protection sets a high bar before a law is deemed to lack even the minimal rationality necessary for it to survive constitutional scrutiny. Coupled with

5

a rebuttable presumption that legislation is constitutional, this high bar helps ensure that democratically enacted laws are not invalidated merely based on a court's cursory conclusion that a statute's tradeoffs seem unwise or unfair." (*Chatman, supra*, 4 Cal.5th at p. 289.)

In cases like this one, where the "plaintiffs challenge laws drawing distinctions between identifiable groups or classes of persons, on the basis that the distinctions drawn are inconsistent with equal protection, courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review." (*People v. Hardin* (2024) 15 Cal.5th 834, 850–851 (*Hardin*).)

We independently review equal protection claims. (*People v. Morales* (2021) 67 Cal.App.5th 326, 345.)

**2.      *Section 1170(d) and related law***

In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), our nation's high court held the Eighth Amendment prohibits LWOP sentences for juvenile offenders who committed non-homicide offenses. (*Id.* at p. 82.) In response to *Graham*, the Legislature enacted section 1170(d), creating a recall and resentencing procedure for certain juvenile offenders sentenced to LWOP terms. (See *In re Kirchner* (2017) 2 Cal.5th 1040, 1049–1050 (*Kirchner*).)

Section 1170(d) provides, in relevant part, "[w]hen a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit

to the sentencing court a petition for recall and resentencing."
(§ 1170, subd. (d)(1)(A).)  The petition must include a statement
describing the defendant's remorse, identifying any work towards
rehabilitation, and stating one of four qualifying circumstances
is true.  (*Id.*, subd. (d)(2).)

As originally enacted, subdivision (d)(2) of section 1170
directed the trial court to hold a hearing to consider whether
to recall a defendant's sentence if the court found, by a
preponderance of the evidence, the statements in the petition
to be true.  (See former § 1170, subd. (d)(2)(E), Stats. 2012,
ch. 828, § 2.)  In 2016, the Legislature amended the statute
to require courts to recall the sentence of any defendant who
meets the eligibility criteria.  (§ 1170, subd. (d)(5), as amended
by Stats. 2016, ch. 867, § 2.1.)  The court must then hold a
hearing "to resentence the defendant in the same manner as if
the defendant had not previously been sentenced, provided that
the new sentence, if any, is not greater than the initial sentence."
(§ 1170, subd. (d)(5).)

Sometime after the Legislature introduced the legislation
that added subdivision (d)(2) to section 1170, the United States
Supreme Court decided *Miller v. Alabama* (2012) 567 U.S. 460
(*Miller*).  (See *Kirchner*, *supra*, 2 Cal.5th at p. 1049.)  In *Miller*,
the court held the Eighth Amendment prohibits sentencing
schemes that mandate LWOP sentences for juvenile offenders
convicted of certain homicide offenses.  (*Miller*, at p. 465.)

Two months later, the California Supreme Court held—
in *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*)—
the prohibition on LWOP sentences for non-homicide juvenile
offenders also applies to "term-of-years sentence[s] that amount[ ]
to the functional equivalent of a life without parole sentence."

(*Id.* at pp. 267–268.) The court explained a sentence is the functional equivalent of LWOP if it includes a "term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy." (*Ibid.*)

In an effort to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*, the Legislature enacted section 3051, which went into effect on January 1, 2014. (See *Stats.* 2013, ch. 312, § 4; *People v. Franklin* (2016) 63 Cal.4th 261, 268, 277 (*Franklin*).) Section 3051 requires the Board of Parole Hearings to conduct a "youth offender parole hearing" at specified times during the incarceration of certain youthful offenders. (See § 3051, subds. (a)(1), (b); *Franklin*, at p. 277.) As relevant to this case, young adult and juvenile offenders convicted of a controlling offense "for which the sentence is a life term of 25 years to life shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration." (§ 3051, subd. (b)(3).) As of January 1, 2018, most juvenile offenders sentenced to explicit LWOP terms are also eligible for parole during their 25th year of incarceration. (§ 3051, subd. (b)(4), as amended by Stats. 2017, ch. 684, § 1.5.)

3. ***Section 1170(d)'s exclusion of functionally equivalent LWOP offenders violates equal protection***

   a. *The* Heard *decision*

The court in *Heard, supra*, 83 Cal.App.5th 608, decided the precise equal protection issue that Sorto raises in this case. In *Heard*, a court had sentenced the defendant to 23 years plus 80 years to life for crimes he committed when he was 15 years old. (*Id.* at p. 612.) The defendant petitioned for relief under section 1170(d) after serving 15 years of his sentence. The trial court denied the petition, finding the defendant ineligible

8

for relief because he had not been sentenced to an explicit LWOP term.  (*Heard*, at p. 612.)

The defendant appealed, raising two arguments.  First, he urged the court to interpret section 1170(d) to apply to both explicit LWOP offenders and functionally equivalent LWOP offenders.  (*Heard, supra*, 83 Cal.App.5th at p. 612.)  The court rejected the defendant's interpretation of section 1170(d), holding the plain language of the statute limits relief to explicit LWOP offenders.  (*Heard*, at p. 626.)

The defendant alternatively argued denying section 1170(d) relief to functionally equivalent LWOP offenders violates the constitutional guarantee of equal protection.  (*Heard, supra*, 83 Cal.App.5th at p. 626.)  Because *Heard* was decided before the Supreme Court clarified the standard for equal protection challenges (see *Hardin, supra*, 15 Cal.5th at pp. 850–851), the court employed a two-step analysis to decide the issue.  At the first step, the court concluded the defendant was similarly situated to explicit LWOP offenders.  (*Heard*, at p. 628.)

The court then turned to the second step of the equal protection analysis, asking whether the Legislature had a rational basis to treat differently explicit LWOP offenders and functionally equivalent LWOP offenders.  (*Heard, supra*, 83 Cal.App.5th at p. 631.)  According to the court, the "People's sole justification for the differential treatment is that the Legislature 'could have reasonably concluded that the punishment of [life without parole] imposed on those under age 18 could be excessive and this was an appropriate means of reform by allowing for reconsideration of such a sentence.' "  (*Id.* at p. 632.)  The court rejected this rationale, explaining the same concern applies

9

equally to juvenile offenders sentenced to the functional equivalent of LWOP.  (*Ibid.*)

After raising two other possible justifications on its own —but ultimately rejecting both—the court concluded it was "unable to identify a rational basis for making juveniles sentenced to an explicitly designated life without parole term, but not juveniles sentenced to the functional equivalent of life without parole, eligible to petition for resentencing under section 1170, subdivision (d)(1)." (*Heard, supra*, 83 Cal.App.5th at p. 633.)  As a consequence, the court held denying functionally equivalent LWOP offenders the opportunity to petition for relief under section 1170(d) violates their right to equal protection of the laws.  (*Heard*, at pp. 633–634.)

The trial court in this case declined to follow *Heard*, stating it was not "on point with our specific factual scenario." It is not clear how the court came to that conclusion, as the facts in this case and the facts in *Heard* are nearly identical in all relevant respects.  As with the defendant in *Heard*, a jury convicted Sorto of crimes he committed when he was 15 years old. Also like the defendant in *Heard*, a court sentenced Sorto to an indeterminate life term that provided no meaningful opportunity for parole during his lifetime.  As in *Heard*, Sorto filed a petition for recall and resentencing under section 1170(d) after serving 15 years of his sentence, seeking relief on equal protection grounds.  Given these similarities, *Heard* is directly on point.

The Attorney General does not attempt to distinguish *Heard* on the facts, and with good reason.  Nevertheless, he urges us not to follow *Heard*, asserting it was wrongly decided and is inconsistent with California Supreme Court precedent. Alternatively, the Attorney General proposes additional reasons

10

—which he apparently did not raise in *Heard*—why the Legislature reasonably could have granted relief to explicit LWOP offenders while denying the same relief to functionally equivalent LWOP offenders.  We consider his arguments in turn.

> b. Heard *is consistent with* Hardin

The Attorney General first argues *Heard* is inconsistent with *Hardin, supra*, 15 Cal.5th 834, a recent case in which the California Supreme Court considered the constitutionality of section 3051.  According to the Attorney General, *Hardin* stands for the proposition that the concept of a "functional equivalent of [LWOP]" sentence should not be extended beyond the Eighth Amendment context.

In *Hardin*, the defendant argued section 3051 violates equal protection by granting relief to young adult offenders sentenced to functionally equivalent LWOP terms, while denying relief to offenders sentenced to explicit LWOP terms.  (*Hardin, supra*, 15 Cal.5th at p. 839.)  He asserted there is "no reasonable basis to conclude that young adult offenders sentenced to life without parole are more culpable or less deserving of the opportunity for release than other young adult offenders."  (*Id*. at p. 858.)

In rejecting the defendant's argument, the California Supreme Court acknowledged it had employed the " 'functional equivalent of a life without parole sentence' " description "in the context of identifying the category of juvenile offenders to whom the Eighth Amendment limitations on life without parole sentences apply."  (*Hardin, supra*, 15 Cal.5th at p. 863.)  However, the court rejected the idea "that a lengthy term-of-years sentence is necessarily equivalent to a life without parole sentence for all purposes."  (*Ibid*.)  The court instead concluded

11

it "was not irrational for the Legislature to exclude from youth offender parole eligibility those young adults who have committed special circumstance murder, an offense deemed sufficiently culpable that it merits society's most stringent sanctions." (*Ibid.*)

Contrary to the Attorney General's suggestion, the Supreme Court in *Hardin* did not hold the concept of a functional equivalent of LWOP sentence is relevant *only* in the context of Eighth Amendment challenges.  Rather, it simply clarified that explicit LWOP offenders and functionally equivalent LWOP offenders are not identical in all respects and for all purposes. That observation is not inconsistent with *Heard*, as equal protection does not require absolute uniformity between two groups.  (See *People v. McKee* (2010) 47 Cal.4th 1172, 1202.) Instead, what matters is whether the differences between the groups reasonably justify the Legislature's decision to afford relief to one, while denying it to the other.  (*Ibid.*)

If anything, *Hardin* supports *Heard* on that issue.  *Hardin* holds the Legislature reasonably may disfavor explicit LWOP offenders based on the rationale that they are more culpable than functionally equivalent LWOP offenders.  (*Hardin, supra*, 15 Cal.5th at pp. 863–864.)  In *Heard*—as in our case—the court considered the opposite situation, asking whether it is reasonable to grant relief to explicit LWOP offenders while denying the same relief to functionally equivalent LWOP offenders.  (*Heard, supra*, 83 Cal.App.5th at p. 631.)  Although *Hardin* does not resolve that issue, it nevertheless eliminates one possible justification for the disparate treatment:  the relative culpability of each group of offenders.

c.      Heard *is consistent with* Franklin

The Attorney General next argues *Heard* "runs roughshod" over the Supreme Court's decision in *Franklin, supra*, 63 Cal.4th 261.

In *Franklin*, a juvenile offender argued his 50-years-to-life sentence was the functional equivalent of LWOP and was unconstitutional under *Miller, supra*, 567 U.S. 460. (*Franklin, supra*, 63 Cal.4th at pp. 268, 271–272.) The Supreme Court declined to consider the issue, holding the enactment of section 3051 rendered it moot. (*Franklin*, at p. 268.) The court explained that, although the defendant's original sentence continued to apply, section 3051 "superseded" the statutorily mandated sentence and made the defendant eligible for parole after 25 years. (*Franklin*, at p. 278.) The court concluded, because a 25-years-to-life sentence is not LWOP or its functional equivalent, "no *Miller* claim arises here." (*Id.* at pp. 279–280.)

The Attorney General argues, under *Franklin*, functionally equivalent LWOP offenders are no longer serving an explicit LWOP sentence or its functional equivalent given they are eligible for parole after serving 25 years. The Attorney General does not directly argue this renders moot equal protection challenges to section 1170(d). Instead—at least as we understand the argument—he contends it renders offenders like Sorto categorically ineligible for relief under section 1170(d), regardless of whether equal protection requires courts to apply the statute to functionally equivalent LWOP offenders.

The Attorney General made a nearly identical argument in *Heard,* albeit in a different context. In that case, the Attorney General argued the defendant was not similarly situated with explicit LWOP offenders—and was therefore not eligible for relief

13

under section 1170(d)—because "section 3051 has ' "reformed" ' [the defendant's] sentence so that it is no longer the functional equivalent of life without parole." (*Heard, supra*, 83 Cal.App.5th at p. 628.) The court rejected the argument, explaining section 1170(d) does not expressly require that the defendant currently be serving an LWOP sentence. (*Heard*, at pp. 629–630.) Instead, it requires only that the defendant "was sentenced" to an LWOP term. (*Id*. at p. 629; see § 1170, subd. (d)(1)(A).) The court reasoned, "[a]lthough under *Franklin*, [the defendant's] sentence as it currently operates is no longer the functional equivalent of life without parole, this does not change the fact that the sentence *was* a [functionally equivalent] life without parole sentence at the time it was imposed." (*Heard*, at p. 629.)

The court in *People v. Lopez* (2016) 4 Cal.App.5th 649 (*Lopez*), interpreted section 1170(d) the same way. *Lopez* concerned two defendants who were sentenced to LWOP terms for non-homicide crimes they committed as juveniles. After the United States Supreme Court decided *Graham,* the defendants petitioned for habeas corpus relief on Eighth Amendment grounds, and a court reduced their sentences to life with the possibility of parole. The defendants then petitioned for relief under section 1170(d), which the trial court also granted. (*Lopez*, at pp. 652–653.) The People appealed, arguing the defendants were not entitled to relief because they were no longer serving LWOP sentences. The Court of Appeal disagreed, explaining the plain language of section 1170(d) requires only that the defendant " 'was sentenced' " to an LWOP term. (*Lopez*, at pp. 653–654.) The court noted, if the Legislature "intended to exclude defendants whose LWOP sentence were modified to cure

14

an Eighth Amendment/*Graham* sentencing error, it could have so provided." (*Id*. at p. 655.)

This interpretation finds further support in the fact that the Legislature amended section 1170(d) several times after *Lopez* was decided, but it has never clarified that an offender must currently be serving an LWOP term to be eligible for relief. (See, e.g., Stats. 2020, ch. 29, § 15; Stats. 2021, ch. 695, § 5; Stats. 2021, ch. 719, § 2; Stats. 2021, ch. 731, § 1.3; Stats. 2022, ch. 744, § 1.) Nor did the Legislature repeal section 1170(d) after it amended section 3051 to grant most juvenile LWOP offenders a meaningful possibility of parole during their lifetimes. (See § 3051, subd. (b)(4), as amended by Stats. 2017, ch. 684, § 1.5.) Because we may presume the Legislature is aware of existing laws and judicial decisions when it enacts and amends statutes (*Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 609), this history strongly suggests the Legislature agreed with *Lopez*. It also suggests the Legislature intended section 1170(d) to provide relief in addition to the relief provided under section 3051.

The Attorney General makes no effort to address the statutory language on which the *Heard* and *Lopez* courts relied. Nor does he directly challenge their interpretation of section 1170(d). We agree with *Heard* and *Lopez* that the plain language of section 1170(d) does not require that the defendant currently be serving an LWOP sentence. Accordingly, the fact that section 3051 superseded Sorto's sentence is irrelevant. Instead, it is enough that he "was sentenced" to the functional equivalent of LWOP. (See § 1170, subd. (d)(1).)

15

d.    *Section 1170(d) can provide meaningful relief to functionally equivalent LWOP offenders*

The Attorney General asserts the *Heard* court failed to recognize section 1170(d) cannot provide meaningful relief to functionally equivalent LWOP offenders. According to the Attorney General, the Legislature enacted section 1170(d) for the sole purpose of converting LWOP sentences into life sentences with the possibility of parole, and the statute "contains no mechanism to shorten or otherwise alter indeterminate sentences that already provide the possibility of parole." Therefore, he argues, functionally equivalent LWOP offenders have already received all the relief section 1170(d) was "intended to confer."

Contrary to the Attorney General's suggestions, section 1170(d) plainly has the potential to grant meaningful relief to functionally equivalent LWOP offenders. This remains true even after the Legislature enacted section 3051. Indeed, the simple fact that offenders like Sorto have filed petitions under section 1170(d)—after already having received relief under section 3051—would seem to refute the Attorney General's contention.

Unlike section 3051—which grants relief by operation of law and without any requirement of additional resentencing procedures (see *Franklin, supra*, 63 Cal.4th at pp. 279–280)—section 1170(d) requires the court to recall an eligible defendant's sentence and "to resentence the defendant in the same manner as if the defendant had not previously been sentenced." (§ 1170, subd. (d)(5).) This difference is not merely procedural. At resentencing, a trial court has broad discretion to select the term of imprisonment, run sentences concurrently or consecutively,

16

and strike or dismiss enhancements.  (See §§ 186.22, subd. (d), 669, 1385, 12022, subd. (f).)  Section 3051 provides no comparable relief.

Perhaps more importantly for individuals like Sorto, recall and resentencing also entitles eligible offenders to the benefits of retroactive ameliorative changes to the law.  (See *People v. Padilla* (2022) 13 Cal.5th 152, 158.)  For example, if the court were to recall Sorto's sentence, his case might be sent to juvenile court under Proposition 57.  (See *People v. Montes* (2021) 70 Cal.App.5th 35, 48–49 [ordering a defendant's case transferred to juvenile court under Proposition 57 after his sentence was recalled under section 1170(d)].)  He also may be entitled to relief under Senate Bill No. 1391 (2017–2018 Reg. Sess.), which prohibits the transfer to criminal court of certain juveniles accused of committing crimes when they were 14 or 15 years old.  (See Welf. & Inst. Code, § 707, subd. (a)(1)–(2), as amended by Stats. 2018, ch. 1012, § 1; *O.G. v. Superior Court* (2021) 11 Cal.5th 82, 89.)  Although we express no opinion as to whether these laws would apply if the court recalls Sorto's sentence, the mere possibility is enough to defeat the Attorney General's contention that section 1170(d) lacks a mechanism to grant meaningful relief to functionally equivalent LWOP offenders.

> e.  *There is no rational basis to treat functionally equivalent LWOP offenders less favorably than explicit LWOP offenders*

The Attorney General alternatively argues the *Heard* court erred in concluding there is no rational basis for section 1170(d)'s disparate treatment of explicit LWOP offenders and functionally equivalent LWOP offenders.  The Attorney General proposes

several reasons justifying the Legislature's decision to grant relief to the former group, while denying it to the latter. We consider each in turn.

    i.    Response to *Graham*

First, the Attorney General argues the Legislature reasonably may have limited section 1170(d) relief to explicit LWOP offenders in response to *Graham, supra*, 560 U.S. 48.

The Attorney General's argument might have some merit if section 1170(d) closely tracked the Supreme Court's holding in that case. It does not. In *Graham*, the high court held the Eighth Amendment bars LWOP sentences for juvenile offenders who committed non-homicide crimes. (*Graham, supra*, 560 U.S. at p. 82.) Section 1170(d), however, extends relief to all explicit LWOP offenders, not just those who committed non-homicide crimes. In fact, an analysis of section 1170(d) by the Assembly Committee on Appropriations noted that, of the 295 juveniles entitled to relief under the legislation, only three had been sentenced to LWOP for non-homicide crimes. (Assem. Com. on Appropriations, Rep. on Sen. Bill No. 9 (2011–2012 Reg. Sess.) as amended Aug. 15, 2011, p. 3 (Assem. Com. on Appropriations Rep.).)

Because section 1170(d) significantly exceeds *Graham*'s requirements, compliance with that case alone does not provide a sufficient justification for the Legislature's decision not to extend relief to functionally equivalent LWOP offenders. Instead, to survive rational basis review, there must be some reasonable explanation for why the Legislature exceeded *Graham* with respect to non-homicide offenders, but did not exceed *Graham* with respect to functionally equivalent LWOP offenders. The Attorney General suggests none, nor can we conceive of any

18

on our own.  In any event, even if compliance with *Graham* justified the disparate treatment at one time, that justification dissipated once the California Supreme Court in *Caballero, supra,* 55 Cal.4th 262, extended *Graham*'s reasoning to functionally equivalent LWOP offenders.

ii.     Moral principles

The Attorney General next argues the Legislature reasonably may have provided relief only to explicit LWOP offenders because the absence of any possibility of parole is a characteristic unique to that group, and condemning minors to die in prison is " 'barbaric.' "  (Assem. Com. on Appropriations Rep., at p. 2.)

A desire to avoid condemning minors to die in prison is obviously a valid reason for the Legislature to grant relief to explicit LWOP offenders.  However, it does not provide a reason to deny the same relief to functionally equivalent LWOP offenders.  By definition, a functionally equivalent LWOP sentence includes a parole eligibility date that falls outside the offender's natural life expectancy.  (See *Caballero, supra*, 55 Cal.4th at pp. 267–268.)  Therefore, like an explicit LWOP sentence, a functionally equivalent LWOP sentence provides no meaningful possibility of parole and effectively condemns the offender to die in prison.  The Attorney General suggests no reason—nor can we conceive of any on our own— why it would be barbaric to condemn explicit LWOP offenders to die in prison, but not barbaric to do the same to functionally equivalent LWOP offenders.  Accordingly, the fact that an explicit LWOP sentence condemns the offender to die in prison does not provide a rational basis for section 1170(d)'s disparate treatment.

### iii.    Empirical facts

The Attorney General contends the Legislature reasonably may have provided relief only to explicit LWOP offenders to address empirical facts unique to LWOP sentences.  He points to an Assembly Committee analysis that notes (1) the " 'U.S. is the only country in the world that sentences minors to LWOP' "; (2) " 'LWOP for minors provides no deterrent effect on crime and is applied disproportionately to persons of color' "; (3) " '45% of the minors sentenced to LWOP did not personally commit murder, but were convicted of felony murder' "; and (4) " 'over 75% of the youth sentenced to LWOP acted within a group at the time of their crime.' "  (Assem. Com. on Appropriations Rep., at p. 3.)  The analysis also notes sentencing minors to LWOP terms is " 'counter to principles of cognitive and emotional development in minors, and all but unprecedented in [the] rest of the world.' "  (*Id*. at p. 2.)

Once again, although these facts provide a reason to grant relief to explicit LWOP offenders, they do not provide a reason to deny the same relief to functionally equivalent LWOP offenders.  There is nothing in the record to support the Attorney General's assertion that these empirical facts pertain *only* to explicit LWOP offenders.  Nor does the Attorney General propose any logical reason why that would be the case.  For all we know, the same facts apply equally to functionally equivalent LWOP offenders.  Absent some reason to expect otherwise, the facts do not provide a rational basis for section 1170(d)'s disparate treatment.

### iv.    Fiscal concerns

The Attorney General next argues the Legislature reasonably could have limited relief under section 1170(d)

in order to restrict the fiscal and administrative burdens of the legislation. The Attorney General points out there were fewer than 300 juvenile offenders serving explicit LWOP sentences at the time the Legislature enacted the statute. He argues it was reasonable to save resources by focusing on that limited group, as opposed to the "vastly larger" population of juvenile offenders serving non-LWOP terms.

Our Supreme Court has explained that "[p]reserving the government's financial integrity and resources is a legitimate state interest." (*Chatman, supra*, 4 Cal.5th at p. 290.) Moreover, equal protection does not require a perfect fit between the legislation's means and the legitimate state interest it is intended to serve. (*Ibid*.) Nevertheless, "an entirely arbitrary decision to withhold a benefit from one subset of people, devoid of any conceivable degree of coherent justification, might not pass rational basis review merely because it decreases the expenditure of resources." (*Id*. at p. 291.) What matters is whether the classification at issue is "a rational means of preserving government resources." (*Ibid*.)

Section 1170(d) fails that test. At the outset, it is not apparent that extending relief to functionally equivalent LWOP offenders would have a meaningful fiscal impact. The Attorney General asserts the population of juvenile offenders serving non-LWOP life sentences is "vastly larger" than the population of explicit LWOP offenders. While that may be true, Sorto does not seek relief for all juvenile offenders sentenced to indeterminate terms. Rather, he argues only that equal protection guarantees relief for juvenile offenders sentenced to the functional equivalent of LWOP. Although the record does not disclose that group's population, it is reasonable

21

to expect it to be significantly smaller than the total population of juvenile offenders serving indeterminate terms.

Even if the population of functionally equivalent LWOP offenders was relatively large, it is not apparent the government would have reasonably expected to preserve resources by denying them relief. In fact, based on section 1170(d)'s legislative history, it seems the Legislature believed the opposite to be true. (Cf. *Chatman, supra*, 4 Cal.5th at pp. 292–293 [relying on the legislative history of a bill to show the Legislature was reasonably concerned about the legislation's cost].) For example, a Fiscal Summary by the Senate Appropriations Committee noted section 1170(d) may result in net General Fund savings, as its resentencing procedure would likely be less expensive than resolution of a petition for writ of habeas corpus. (Sen. Appropriations Com., Fiscal Summary of Sen. Bill No. 9 (2011–2012 Reg. Sess.) May 23, 2011, p. 2 (Sen. Appropriations Com. Fiscal Summary).) The summary also estimated that reducing an LWOP sentence to 25 years would result in an average cost savings of $625,000, far outweighing the administrative and court costs of the resentencing procedure.[3] (*Id.* at pp. 2–3.) We see no reason why the same cost savings would not apply equally to functionally equivalent LWOP offenders. If so, extending relief to that group would likely save government resources, at least in the long term.

---

[3] The summary noted the savings would be offset somewhat by parole supervision costs assessed as a condition of the reduced sentence. (Sen. Appropriations Com. Fiscal Summary, at p. 3.) Even with that offset, we suspect the savings would be significant.

The Attorney General notes in passing it is less costly to grant relief to functionally equivalent LWOP offenders under section 3051 than to grant the same group relief under section 1170(d). While that may be true, the Attorney General overlooks the fact that the Legislature also granted section 3051 relief to explicit LWOP offenders. (See § 3051, subd. (b)(4).) That the Legislature did not repeal section 1170(d) after doing so strongly suggests it was not concerned about the legislation's relative cost.

v.    Culpability

Finally, the Attorney General contends section 1170(d)'s disparate treatment is warranted by the fact that an explicit LWOP sentence "provides a bright-line test of culpability," while there is no comparable test of culpability for functionally equivalent LWOP sentences.

To the extent the Attorney General is arguing the Legislature may have been concerned that some functionally equivalent LWOP offenders are more culpable than explicit LWOP offenders, the court in *Heard* rejected a similar argument. (See *Heard, supra*, 83 Cal.App.5th at p. 633.) As that court explained, because a functionally equivalent LWOP sentence requires multiple convictions, it is conceivable the Legislature considered a functionally equivalent LWOP sentence to be more serious than an explicit LWOP sentence, which requires only a single conviction. However, the court rejected this as a possible motivation for section 1170(d)'s disparate treatment because the statute does not preclude relief for offenders sentenced to explicit LWOP terms plus additional terms for other offenses and enhancements. (*Heard*, at p. 633.) Therefore, the court concluded, the "number of offenses theoretically committed

23

by each group of offenders also fails to justify their disparate treatment." (*Ibid*.)

We agree with the *Heard* court's reasoning, and the circumstances of Sorto's case aptly illustrate the irrationality of using relative culpability to justify section 1170(d)'s disparate treatment. The jury convicted Sorto of special circumstance first degree murder, which typically results in an LWOP sentence. (See § 190.2, subd. (a).) However, because Sorto was 15 years old when he committed the crime—and presumably less mature and culpable than older offenders—the maximum sentence he could receive was 25 years to life. (See § 190.5, subd. (b).) Had Sorto instead committed the murder when he was older, he likely would have received an LWOP sentence, making him eligible to apply for section 1170(d) relief. In other words, had Sorto committed the exact same crimes but under circumstances indicating he was more culpable, he likely would be eligible for relief. We can conceive of no rational basis that would justify such a seemingly unreasonable result.

To summarize, like the court in *Heard*, we can conceive of no rational basis for section 1170(d)'s disparate treatment of explicit LWOP offenders and functionally equivalent LWOP offenders. (*Heard, supra*, 83 Cal.App.5th at p. 633.) Therefore, we agree with the *Heard* court that section 1170(d) violates the constitutional guarantee of equal protection by denying relief to juvenile offenders sentenced to functionally equivalent LWOP terms. (*Heard*, at pp. 633–634.) We also agree with the *Heard* court that parole eligibility under section 3051 does not render an offender ineligible for relief under section 1170(d). (*Heard*, at p. 629; see *Lopez, supra*, 4 Cal.App.5th at p. 655.)

24

Accordingly, we conclude the trial court erred by denying Sorto's section 1170(d) petition "because [he] was not sentenced to life without the possibility of parole." We express no opinion on whether Sorto has met section 1170(d)'s other requirements. Nor do we express an opinion on what relief the court should grant if it concludes Sorto is eligible for recall and resentencing. On remand, the trial court shall consider those issues for the first time.

## DISPOSITION

We reverse the order denying Eddie Sorto's petition for relief under section 1170(d). On remand, the court shall reconsider Sorto's petition in accordance with this opinion.

**CERTIFIED FOR PUBLICATION**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.

25